**Affirm in part, reverse and render in part and Opinion Filed December 8, 2014**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-12-00227-CV

### BO KYOUNG KIM AND SANG J. PARK, Appellants
### V.
### SOK SAN PAK, Appellee

**On Appeal from the 416th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 416-00730-2008**

## MEMORANDUM OPINION
Before Justices Francis, Lang-Miers, and Myers
Opinion by Justice Francis

Bo Kyoung Kim and Sang J. (John) Park appeal the trial court's judgment in favor of Sok San Pak. In five issues, Kim and John claim the evidence is legally and factually insufficient to support the jury's findings that they breached any contract with or committed fraud against Pak and that opposing counsel's repeated questions and jury argument about appellants' visa status was incurable reversible error. We affirm in part and reverse and render in part.

Pak was the president and sole shareholder of S.S.P. C-Store, Inc. The corporation owned and operated the Speedy Food Mart convenience store and gas station in Sachse. Pak's son, Mike Pak, was his father's agent and was responsible for all of the corporation's operations, including managing the Speedy Food Mart. After talking to Mike about the business, Kim and her husband, John, began investing in S.S.P. C-Store, Inc. in December 2006. By the summer of

2007, they held 51% of the ownership in the corporation. John took over management of the store, including paying the bills, making the bank deposits, and managing the checkbook.

In March 2008, Pak, Kim, and John agreed to sell the Sachse Speedy Food Mart. According to Mike, the parties were going to buy land in Prosper and build a Speedy Food Mart there. The day before the closing, the title company sent Mike a settlement statement which indicated the net proceeds of the sale were to go to Kim. Mike contacted the title company to inform them of the mistake and discovered someone had submitted a document, purportedly signed by Kim and Pak, authorizing the transfer of all the sales proceeds to Kim's account. Mike called John to find out what was going on. John said he and Kim needed the funds in their personal account to support the renewal of Kim's E-2 visa. John promised to give Mike two checks, a $75,000 one to cover the "winding up" costs not covered at closing and a $300,000 check payable to Cathay Bank to fund the purchase of land for the Speedy Food Mart in Prosper if the funds went to Kim's account. Pak and Mike went to the closing where Pak signed off on the sale of the Sachse store, allowing the funds to go to Kim's account. The next day, John gave Mike a check for $75,000 but said he forgot the $300,000 one. He promised he would return with it later that day. When he did not return, Mike tried calling but John did not answer. Mike attempted to cash the check but was told a stop payment had issued. Mike was unable to speak with John despite numerous attempts to call or contact him.

Pak sued John and Kim for breach of contract, fraud, fraud by nondisclosure, and breach of fiduciary duty. After she and John filed an answer, Kim filed a third-party petition against Pak and Mike alleging breach of the covenant of good faith and fair dealing, breach of fiduciary duty, fraud, securities fraud, conversion, civil conspiracy, among other things. The case proceeded to trial. In questions 3 and 5 of the jury charge, the jury found Kim and John breached their contract to pay Pak $75,000 and the store's post-sale expenses and awarded Pak

$75,000 for each breach of contract claim.  The jury also found Kim and John committed fraud and awarded Pak $206,814.72 in damages and $620,444.16 in exemplary damages.  The trial court entered judgment in favor of Pak and awarded the amounts found by the jury.  After filing a motion for judgment non obstante veredicto and a motion for new trial, both of which were denied, Kim and John filed this appeal.

In their second issue, Kim and John contend there is no evidence or factually insufficient evidence to support the jury's finding that they breached a contract with Pak because there is no or factually insufficient evidence they had a contract with Pak.

When, as here, appellants attack the legal sufficiency of an adverse finding on an issue on which they did not have the burden of proof, they must demonstrate that no evidence supports the finding.  *See Exxon Corp. v. Emerald Oil & Gas, Co.*, 348 S.W.3d 194, 215 (Tex. 2011).  In reviewing the legal sufficiency of the evidence, we credit evidence that supports the finding if a reasonable fact finder could, and disregard contrary evidence unless a reasonable fact finder could not.  *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).  Anything more than a "scintilla of evidence" is legally sufficient to support the finding.  *Cont'l Coffee Prods., Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996).  To be more than a scintilla, the evidence must rise "to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex. 1994). In reviewing a factual sufficiency challenge, we consider and weigh all the evidence in support of and contrary to the finding and will set aside the verdict "only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).

To succeed on a breach of contract claim, a plaintiff must show (1) a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the

defendant, and (4) damages sustained by the plaintiff as a result of the breach. *Marquis Acquisitions, Inc. v. Steadfast Ins. Co.*, 409 S.W.3d 808, 813 (Tex. App.—Dallas 2013, no pet.).

The jury charge asked if Kim or John failed to comply with the agreement with Pak of paying (1) the store's post-sale expenses or (2) $75,000. The jury answered "Yes" as to each question. Although Kim and John assert there is no evidence to support either answer, we disagree.

The evidence at trial showed Pak gave "complete and blanket control" to Mike. Pak understood that whatever Mike did related back to Pak. Likewise, Kim and John knew Mike acted for his father and Pak had no knowledge of the business dealings. Shortly before closing, Mike received a settlement agreement from the title company. The statement showed the net proceeds of the sale were to be deposited in Kim's account. When he asked people at the title company about it, they sent him a copy of a document which stated Kim had invested $500,000 in S.S.P. C-Store, Inc. and that she was entitled to all of the proceeds of the sale of the store as "returning investment money as the parties agreed." The document was purportedly signed by Mike's father.

Mike assumed John or Kim sent the agreement to the title company. He called John and asked what was going on. John said he and Kim needed the full amount of the proceeds to be deposited in their personal account for Kim's E-2 visa renewal. According to Mike, John started crying and said his "family [was] going to get kicked out of the country." John promised to give Mike a check for $75,000 to cover the expenses left over from winding up the store as well as a $300,000 check to finance the next project if Pak and Mike allowed the money to be deposited to Kim's account.

At the title company's urging, Mike again contacted John and asked if they could deposit the funds in an escrow account under Kim's name at the title company. John said he would talk

to his attorney but later called Mike and said "that cannot happen, it has to be in their personal account." Although John did not show up with the check that day, Mike and his father nevertheless decided to help them out and signed the documents for closing. The next morning, John showed up at Mike's house with the $75,000 check. When Mike asked about the other check, John said he forgot it but would come back with it. John did not return that day. Mike tried calling John repeatedly and went to his house but John did not answer. When Mike tried to deposit the check, the bank told him a stop payment had been placed on the check. Neither Mike nor his father received the $75,000 from Kim or John. Mike said the $75,000 was to cover the closing up expenses.

After reviewing all the evidence, we conclude there is more than a scintilla of evidence to the support the jury's finding that Kim or John failed to comply with the agreement with Pak of paying (1) the store's post-sale expenses or (2) $75,000. Mike, acting as his father's agent, agreed to allow the net proceeds of the sale to be deposited into Kim's personal account in exchange for John's promise to pay $75,000 for the post-sale expenses incurred at the Sachse store. Mike and his father then went to the closing and signed off on the sale, allowing the funds to be deposited in Kim's account. Furthermore, after considering and weighing all the evidence, we conclude the verdict is not "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust."

In reaching this conclusion, we reject Kim and John's argument on appeal that there is no evidence of a contract because Pak testified he had no knowledge of an agreement with Kim or John. The record, including Kim's third-party petition, Mike's testimony, and Pak's testimony, is replete with evidence that Mike was his father's agent, handled all the business involving the Speedy Food Mart, as well as S.S.P. C-Store, Inc., and made all the business decisions. Pak testified he turned all the business dealings over to Mike and they agreed to depositing the funds

in Kim's account because it was their way of "giving help to them." He also said Kim and John were to return Pak's portion of the sale proceeds to him. In light of the evidence, we overrule Kim and John's second issue.

In their third issue, Kim and John claim that, even if they did breach the contract, the $150,000 damage award constitutes a double recovery. We agree.

A double recovery exists when a plaintiff obtains more than one recovery for the same injury. *See Waite Hill Servs., Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184 (Tex. 1998). In this case, the jury awarded $75,000 to Pak for Kim and John's failure to comply with the agreement of paying the S.S.P. C-Store, Inc. post-sale expenses as well as $75,000 for their failure to comply with the agreement of paying $75,000 to Pak. The evidence at trial, however, established John promised to give Mike a check for $75,000 which "was supposed to cover the expenses left over." Because we have found no evidence of two separate agreements, each involving an agreement to pay $75,000, we conclude the trial court erred by awarding both damages. We sustain Kim and John's third issue.

In their fourth and fifth issues, Kim and John contend there is no or factually insufficient evidence that they committed fraud. Kim and John argue Pak could not establish fraud because Pak testified he did not have any communications with either individual. They also contend no one testified that they made a false statement or intended anyone rely on the same. They do not complain about the damage award associated with the finding of fraud.

To prevail on his fraud claim, Pak had to prove (1) Kim and John made a material representation that was false; (2) they knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) they intended to induce Pak to act upon the representation; and (4) Pak actually and justifiably relied upon the representation and thereby suffered injury. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577

(Tex. 2001). Although a misrepresentation need not be directly communicated by the speaker to the relying party, a misrepresentation must reach the relying party and influence his conduct. *Id*. at 580, 581; *Marshall v. Kusch*, 84 S.W.3d 781, 785 (Tex. App.—Dallas 2002, pet. denied). A promise to do an act in the future is actionable fraud when made with the intention, design, and purpose of deceiving, and with no intention of performing the act. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986). While a party's intent is determined at the time the party made the representation, it may be inferred from the party's acts after the representation is made. *Id*. While the failure to perform, standing alone, is no evidence of the promisor's intent not to perform when the promise was made, it is a circumstance to be considered with other facts to establish intent. *Id*. at 435. Because intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence. *Id*.; *Hunter v. PriceKubecka, PLLC*, 339 S.W.3d 795, 805 (Tex. App.—Dallas 2011, no pet.). Thus, "[s]light circumstantial evidence of fraud,' when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent." *Spoljaric.*, 708 S.W.2d at 435.

Here, the evidence established someone gave the title company a document directing that all of the proceeds from the sale of the Sachse store be deposited into Kim's personal account. When Mike called John to find out what was going on, John told him Kim's E-2 visa was up for renewal and said they needed the net proceeds from the sale of the Sachse Speedy Food Mart deposited into their personal account to show they were investing in this country. John told Mike if they did not have the funds deposited, their family would be deported. In return, John promised Mike the two checks. Pak testified he agreed to transfer the funds to Kim and John to give "help to them" after Mike explained what was going on. Pak also said Kim and John agreed the amount due Pak from the Sachse sale was to be returned to him. Pak received no funds from either Kim or John, and the $75,000 check given to Mike had a stop payment issued. Mike

testified that after he discovered the stop payment on the check, he called John about fifty times and drove by his house, but John did not pick up his phone or answer. Neither Pak nor Mike received any funds from the sale of the Sachse store.

When asked about the funds from the sale, Kim asserted several times that she was entitled to the entire proceeds of the sale as a "return of investment" and Pak still owed her about $100,000. Kim admitted having an E-2 visa and that, "to comply with [her] visa," she had to show money from the sale of the store. She conceded she could have shown the sales from her dry cleaning business for the visa requirements but that she "also wanted to show the – the invested money from my account." This is legally and factually sufficient evidence that Kim and John represented that they needed the funds from the sale for visa purposes but would return Pak's portion later; because they did not intend to return the funds, they knew this was false or made it recklessly as a positive assertion without any knowledge of its truth; they intended that Pak act upon their representation they would return the funds; and Pak actually and justifiably relied upon their representation and thereby suffered injury. We overrule their fourth and fifth issues.

In their first issue, Kim and John contend we must reverse the trial court's judgment because Pak's counsel asked repeatedly about their immigration status and later presented jury argument on the same issue. Under this argument, Kim and John claim the questions were irrelevant and served only to "undercut the equality and fairness of justice rendered by the courts."

We first note that no objections were lodged in the trial court. As a general rule, a party must preserve error as to improper questions or argument by lodging a timely objection which is overruled. *In re Toyota Motor Sales, U.S.A., Inc.*, 407 S.W.3d 746, 760 (Tex. 2013); *Living Ctrs. of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 680 (Tex. 2008). Furthermore, the complaining

party must not have invited or provoked the improper argument. *See Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839 (Tex. 1979).

Here, Kim and John's counsel made no objections to the questions about Kim's visa or the couple's immigration status, nor did he object to any jury argument about the same. In fact, the majority of the questions Kim and John complain of on appeal occurred during cross-examination, after their counsel had questioned them on the same issues. In light of this, we cannot conclude Kim and John have preserved these complaints.

Kim and John nevertheless argue that under the supreme court's opinion in *Penalver*, they were not required to object because this is one of those rare instances in which the probable harm or prejudice cannot be cured. To prevail on a claim that improper argument was incurable, the complaining party generally must show that the argument by its nature, degree, and extent constituted such error that an instruction from the court or retraction of the argument could not remove its effects. *Penalver*, 256 S.W.3d at 680−81. The test is the amount of harm from the argument "whether the argument, considered in its proper setting, was reasonably calculated to cause such prejudice to the opposing litigant that a withdrawal by counsel or an instruction by the court, or both, could not eliminate the probability that it resulted in an improper verdict." *Id*. at 681.

In *Penalver*, a nursing home, its administrators, and directors were sued when an elderly patient died as the result of a fall while being transferred from her wheelchair to her bed. *Id*. at 679. During closing argument, Penalver's counsel referred to Germany's World War II project and compared Penalver's treatment to the atrocities inflicted on older, impaired people by the Nazi party. *Id*. at 680−81. The supreme court reversed the trial court's judgment, concluding counsel's argument "struck at the heart of the jury trial system, was designed to turn the jury

against opposing counsel and his clients, and was incurable." *Id*. at 682. The facts and circumstances in *Penalver* are distinguishable from those of this case.

Here, Kim and John told Mike they needed the full amount of the proceeds from the sale to help renew Kim's E-2 visa. The existence of the visa issue as well as their immigration status was therefore relevant to the case. Kim and John's counsel questioned them about their visa status. On cross-examination, opposing counsel asked questions that further developed the evidence for the jury and, considered in their proper setting, did not adversely affect "the fairness and equality of the rendition of justice" in this case. Later jury argument reiterated what the questions revealed. Under these facts and circumstances, we cannot conclude the questions and argument of opposing counsel constituted reversible error. We overrule Kim and John's first issue.

We reverse the trial court's judgment awarding Pak $37,500 from Bo Kyoung Kim and $37,500 from Sang Jun (John) Park for "failing to comply with the agreement of paying $75,000.00" in conjunction with Jury Question 5 and render judgment Pak take nothing on this claim. In all other respects, we affirm the trial court's judgment.

120227F.P05

/Molly Francis/
MOLLY FRANCIS
JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

BO KYOUNG KIM AND SANG J. PARK, Appellants

No. 05-12-00227-CV      V.

SOK SAN PAK, Appellee

On Appeal from the 416th Judicial District Court, Collin County, Texas
Trial Court Cause No. 416-00730-2008.
Opinion delivered by Justice Francis, Justices Lang-Miers and Myers participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part. We **REVERSE** that portion of the trial court's judgment awarding Sok San Pak $37,500 from Bo Kyoung Kim and $37,500 from Sang Jun (John) Park for "failing to comply with the agreement of paying $75,000.00" in conjunction with Jury Question 5 and **RENDER** judgment that Sok San Pak take nothing on that claim. In all other respects, we **AFFIRM** the trial court's judgment.

We **ORDER** that appellee SOK SAN PAK recover his costs of this appeal from appellant BO KYOUNG KIM AND SANG J. PARK.

Judgment entered this 8th day of December, 2014.